415 So.2d 467 (1982)
Calvin Eugene IRVINE and Annie Jane Hill Irvine
v.
SENTRY INSURANCE COMPANY.
No. 14812.
Court of Appeal of Louisiana, First Circuit.
May 25, 1982.
*468 John N. Gallaspy, Bogalusa, for plaintiffs.
Edward L. Levert, Jr., New Orleans, for defendant.
Before COVINGTON, COLE and WATKINS, JJ.
COLE, Judge.
The basic issue presented here is whether or not the trial court was clearly wrong in finding plaintiff to be partially disabled as the result of an accident which occurred during the course and scope of her employment.
The facts are as follows. Plaintiff, Annie Irvine, was employed as a bookkeeper at G. E. Thomas Auto Parts in Bogalusa, Louisiana. On October 30, 1979, she stumbled and twisted her ankle while entering the building via a concrete ramp. There were no witnesses to the accident. Plaintiff consulted her family physician, Dr. John Newman, that same day. He found no evidence of fracture from x-rays taken and ordered her to stay off her foot and to keep it elevated. She did so for several days but the swelling and pain persisted. She attempted to return to work about a week later but was so uncomfortable she went home at noon. Dr. Newman referred her to an orthopedic specialist, Dr. Daniel Sinclair, who put her foot in a cast. This brought no relief and was removed about a week later. Depositions introduced at trial show she was seen by two other orthopedic specialists, Dr. Luis Matta and Dr. Ray Haddad, whose testimony will be examined below.
After the employer's workmen's compensation carrier (Sentry Insurance Company) refused to pay benefits, Mrs. Irvine and her husband filed suit on March 24, 1980. The trial court determined Mrs. Irvine was permanently partially disabled and rendered judgment accordingly. Sentry Insurance Company (Sentry) appealed. Plaintiffs answered the appeal seeking to have the $2,500 attorney's fees increased to $5,000.
In deciding this appeal there are four subsidiary issues to be determined. One, did Mrs. Irvine's alleged injury occur within the course and scope of her employment? Two, was she in fact partially disabled under La.R.S. 23:1221(3)? Three, was Sentry arbitrary and capricious in their refusal to pay the compensation benefits so as to entitle Mrs. Irvine to receive penalties and attorney's fees? Finally, should the amount of attorney's fees be increased?
We have no doubt Mrs. Irvine's alleged accident occurred within the scope and course of her employment. Even though the accident occurred outside the building and prior to the time she began her bookkeeping duties, it has been held employees injured while on the job site and while preparing for work are injured within the course and scope of their employment. Sanders v. Kirby, 171 So.2d 281 (La.App. 1st Cir. 1965).
*469 Defendant contends the employee's testimony alone is not enough to establish the accident actually occurred within the scope and course of the employment, as opposed to having occurred elsewhere and cites Wright v. Red Ball Motor Freight, Inc., 315 So.2d 344 (La.App. 1st Cir. 1975). We have examined the cited case and note it holds an employee's testimony can be sufficient to establish the accident occurred within the scope and course of the employment when such testimony is corroborated by other credible evidence. Mrs. Irvine's testimony concerning the accident was corroborated by the following evidence.
Her husband, Calvin Irvine, testified she had called him the morning of the accident and asked him to come to her place of work to examine her foot. He stated, "She told me she had tripped and sprained her foot and I looked at it." He observed the foot to be swollen and advised her to go to a doctor.
Three other employees were in the auto parts store on the date of the accident. One employee, Bill Moody, testified Mrs. Irvine told him she had gotten out of her car and twisted her ankle. Another employee, Hoyle Griffin, related she had told him at lunch time her foot hurt because she had turned to get up and had twisted her ankle. The third employee, Donald Johnson, said she had never mentioned her injury to him.
There is very little evidence to contradict plaintiff's claim the injury occurred while Mrs. Irvine was at work. We agree with the trial court it is totally unremarkable a co-employee, such as Donald Johnson, does not recall being informed of the injury, although Mrs. Irvine testified she saw him immediately after the accident and told him of her problem. As the trial court noted, "Initially, the accident was not considered serious by Mrs. Irvine or any of her co-employees, and there was no reason for this incident to be firmly and clearly entrenched in the memories of the co-employees."
Defendant points out Dr. John Newman testified the degree of discoloration and amount of swelling of the foot were indicative of the accident occurring several days prior to the time he saw Mrs. Irvine. (He had no notation as to when she said the accident occurred.) We note when he was questioned further about the possibility of the accident occurring on the same day as his examination, he testified such an event was entirely possible: "You see, nothing in this particular science is exact, and there are no such words in medicine as `never' and `always.' It might have been an hour before, or it might have been days before." When questioned about his opinion of Mrs. Irvine's veracity he responded that she was a "salt-of-the-earth type person." He stated that if she claimed the accident had occurred on the same day, her symptoms would have been consistent with that claim.
We conclude Mrs. Irvine's claim as to where and when the accident occurred is corroborated by credible evidence. Therefore she has proven the accident occurred within the scope and course of her employment.
The second issue is whether or not the trial court erred in finding Mrs. Irvine permanently partially disabled. We will discuss this issue in terms of expert testimony, lay testimony, and credibility of the witnesses.
The expert testimony was offered by various depositions. All four doctors agreed Mrs. Irvine suffered, and continued to suffer as of the date of trial, from soreness and swelling of the right foot and ankle. Her personal physician, Dr. John Newman (accepted by the attorneys as an expert in family practice), stated he had examined Mrs. Irvine five times from October 1979, until November 1980. He had referred her initially to Dr. Daniel Sinclair, an orthopedic surgeon in Covington and later to Dr. Ray Haddad, the chairman of the Department of Orthopedics at Tulane Medical School. Dr. Newman stated that when he last examined her (November of 1980), he found a 50% disability of the right foot and ankle. He recommended she stay off the foot as much as possible because of the constant recurrence of the swelling which occurred whenever she put weight on the foot.
*470 When asked if he would recommend Mrs. Irvine return to the type of job she had before, Dr. Newman said it would not be physically advisable for her to do so. He noted that although her job was basically a sedentary one, it did require her to be on her feet while doing the miscellaneous chores which are a part of any secretarial or bookkeeping job. He noted even minimal movement and weight bearing would contribute to the swelling and pain. He described Mrs. Irvine as a stoic person who complained very little about her condition.
Dr. Ray Haddad testified he first saw Mrs. Irvine on July 11, 1980. After taking x-rays he diagnosed her condition as an avulsion fracture.[1] After her second visit the foot showed no improvement so he recommended she undergo surgery. When asked if she could continue her job as a bookkeeper he stated that she could. Even if she had to be standing, so long as she could move around, he thought her capable of such work. He admitted he did not actually treat Mrs. Irvine but simply served as a consultant for Dr. Newman.
Dr. Daniel Sinclair saw Mrs. Irvine in November of 1979, just several days after the initial injury. He diagnosed her condition as a severe sprain of the right ankle and mid-dorsal joint. He put a cast on her leg but it caused so much discomfort and swelling that he removed it after a week. He saw her a total of six times, until March 1980. Each time he noted swelling and she complained of pain. He disagreed with Dr. Haddad's diagnosis of a fracture. His final conclusion was that she had a 6¼% permanent disability of the right foot. When asked the question as to whether or not she could work at a job that was 90% sedentary, he answered in the affirmative.
The final medical opinion was offered by Dr. Luis Matta, an orthopedic surgeon employed by Sentry. He examined Mrs. Irvine two times, once in February of 1980 and again at an unspecified later date. He found her foot and ankle swollen on both occasions although less so on the second examination. He recommended she move around to relieve her problem and stated she should be able to resume the type work she had been doing. He disagreed with the recommendation of the other doctors as to soaking the foot in hot water and stated this had probably aggravated the condition. He found her to have full functioning of the foot.
We quote now from the written reasons as to the court's impression of the medical testimony.
"From the depositions of the physicians, it is obvious none of them took the time to determine with specificity the job duties of Mrs. Irvine. These duties were clearly pointed out to the Court, however. None of the doctors considered Mrs. Irvine a malingerer. The swelling in the ankle persisted. This corroborates her complaints of pain. The persistence of the pain and swelling corroborates the distinction made by Dr. Sinclair of the ability of different patients to recover as quickly as others from the same type injuries, as well as the diagnosis of Dr. Haddad that the plaintiff's injuries involved something more than a severe ankle sprain."
Dr. Newman stated unequivocally that it was not advisable for her to resume her duties at G. E. Thomas Auto Parts. His opinion seemed to be colored by his appreciation of the inevitability of walking and standing even in a "sedentary" type job. We agree common sense dictates any type of secretarial or bookkeeping job will always require some movement away from the desk. Although the three other doctors felt she could return to her job, we note that mere numerical majority of expert witnesses is not sufficient for determination of a decision in workmen's compensation cases. Bean v. Higgins, 230 La. 211, 88 So.2d 30 (1956).
*471 The trial court apparently gave greater weight to the testimony of Dr. Newman than to that of the three other physicians. The record shows Mrs. Irvine was seen five times by Dr. Newman, six times by Dr. Sinclair and two times by each of the other two doctors. Therefore, both Dr. Newman and Dr. Sinclair could be characterized as her "treating physician." We note Dr. Newman treated her from the time of the accident (October 1979) until the time of the trial (November 1980). Dr. Sinclair treated her for a shorter time period, from shortly after the accident until March 1980. We find no abuse of discretion in the trial court giving greater weight to the testimony of Dr. Newman who obviously had the best overall knowledge of the patient's condition and had more familiarity with her job duties. It is well settled that in workmen's compensation cases the testimony of a treating physician, who has had the benefit of repeated examinations and sustained observation of the injured person, is accorded greater weight than specialists who may have seen the claimant only briefly. Turner v. American Mut. Ins. Co., 375 So.2d 113 (La.App. 3d Cir. 1979), reversed on other grounds 390 So.2d 1330 (La.1980); Meshell v. Rivers, 348 So.2d 203 (La.App. 3d Cir. 1977), writ refused 1977.
In summary, both "treating" physicians agreed she suffered some permanent disability. Dr. Sinclair's estimate of 6¼% disability was much more conservative than Dr. Newman's estimate of 50%. They disagreed as to her ability to resume her position as a bookkeeper. In light of this conflicting testimony it is apparent the trial court was influenced to some extent by factors other than the medical testimony. It is entirely proper, and in fact is the duty of the trial judge in workmen's compensation cases to evaluate testimony of all witnesses, both lay and medical; and, after making such evaluation he may accept or reject an opinion expressed by any medical expert depending on how impressed he is with qualifications, credibility and testimony of that expert. Victoriana v. Orleans Parish Sch. Bd., 346 So.2d 271 (La.App. 4th Cir. 1977). When there is a conflict in medical testimony the court should consider the lay testimony in determining whether or not plaintiff is disabled. Meshell, supra.
We now examine the pertinent lay testimony that obviously influenced the trial court's decision. Mrs. Irvine testified she experienced pain and continued swelling from the date of the accident up through the date of the trial. Although the swelling would subside when she remained off her foot, it would return when she moved about to any extent.
Concerning her job duties, she testified she spent her mornings bookkeeping and the afternoons tending to the "cardex," an inventory system. Sometimes while using the cardex she had to get up to check on an item in stock. In addition to these two major duties she waited on customers when the other employees were busy, which involved retrieving parts from the back of the shop. She would occasionally get up to answer the telephone and would go into the shop to get an employee if he had a phone call. She did all the filing and went to the bank daily. She estimated she spent 3 or 4 hours a day on her feet.
She testified that since the accident she could do very little housework at home. Her husband had cooked supper ever since the injury and her daughters had helped her with the housework. She could drive the car sometimes but was unable to do chores such as grocery shopping. She stated she had not had the surgery yet because she could not afford it.
Mrs. Irvine's husband, Calvin Irvine, testified he noticed his wife has a good deal of pain in the evenings. He corroborated her statements about her inability to do housework, cooking and shopping. Annie Fairley, Mrs. Irvine's grandmother, testified that her granddaughter had been an energetic person prior to the accident and had always been able to do her housework. After the accident Mrs. Fairley had observed the swelling of the ankle daily and knew Mrs. Irvine was not able to do the housework, shopping or cooking.
*472 Mr. Fielding Bates, the secretary-treasurer and general manager for G. E. Thomas Auto Parts, testified concerning Mrs. Irvine's job description. He stated her job was 90% sedentary and required her to be on her feet only 10% of the time.
After hearing all the testimony the trial court made the following observation concerning Mrs. Irvine's credibility:
"The court closely observed Mrs. Irvine and concludes that she is a sincere, truthful lady who would prefer earning her way as compared to surviving on worker's compensation benefits."
It has been held time and time again that where evidence is conflicting the appellate court should not disturb the trier of fact's reasonable evaluation of one set of witnesses as credible and its consequent rejection of testimony of the opposing set of witnesses. Nor should a reviewing court disturb the trier of facts reasonable factual inferences drawn from testimony found by it to be credible. Billiot v. Bourg, 338 So.2d 1148 (La.1976); McMillan v. Travelers Ins. Co., 371 So.2d 1213 (La.App. 1st Cir. 1979); Fountain v. Anacoco Sand & Gravel Inc., 352 So.2d 410 (La.App. 3d Cir. 1977). Therefore, we will not disturb the trial court's decision to accept Mrs. Irvine's testimony concerning her condition and her disability.
There was substantial evidence showing Mrs. Irvine was partially disabled within the meaning of La.R.S. 23:1221(3). That subsection of the statute reads in pertinent part as follows:
"For injury producing partial disability of the employee to perform the duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience...."
Mrs. Irvine testified she was a bookkeeper by education and experience. We find no manifest error in the trial court's conclusion that Mrs. Irvine is disabled from doing bookkeeping or similar work, because any such work involves movement to some extent and cannot be done properly by someone who is unable to move about. The court, impressed by Mrs. Irvine's truthfulness and by Dr. Newman's expert opinion, did not err in determining Mrs. Irvine was permanently partially disabled.
Next, we address the issue of whether or not Sentry was arbitrary and capricious in failing to pay benefits and is therefore subject to penalties and attorney's fees under La.R.S. 22:658.[2] The injury occurred on October 30, 1979. Mrs. Irvine apparently made a claim for benefits sometime prior to November 12, 1979, when it became apparent to her she was unable to return to work. Dr. Sinclair sent a report to Sentry dated November 12, 1979, in which he stated Mrs. Irvine could report to work.[3] A Sentry agent, Ms. Susan Rolfes, telephoned Mrs. *473 Irvine on November 21, 1979, and took a statement. Mrs. Irvine explained she was unable to work because her foot continued to hurt and swell and gave Ms. Rolfes information concerning the accident and the condition of her foot.
The next communication to Sentry was a report from Dr. Matta, dated March 3, 1980. Mrs. Irvine's problems were described and Dr. Matta stated, "I feel that in approximately one month she should be able to return back to regular duties and feel that external evidence of injury would probably be gone." At this point, in addition to the claimant's statement of November 21, which clearly indicated she was unable to work, Sentry was apprised by its own doctor that the patient was unable to work for at least another month. This is an apparent admission that she had been unable to work prior to and at the time of Dr. Matta's examination.
Dr. Sinclair submitted another report dated April 22, 1980, in which he reported the results of his March 24 examination of Mrs. Irvine. He found her to continue to have pain and swelling of the right ankle and foot. No mention was made of her ability to return to work.
Looking at this evidence in totality we find no error with the trial court's determination that Sentry was arbitrary and capricious in its refusal to pay. The trial court's conclusion as to this matter is partially a factual determination which should not be disturbed absent a finding of manifest error. Carter v. American Mut. Liability Ins. Co., 386 So.2d 1072 (La.App. 3d Cir. 1980). The record establishes that in spite of the multiple reports by medical experts and claims by the insured, Sentry did not pay one cent. Apparently they continued to rely upon the initial report by Dr. Sinclair that Mrs. Irvine was able to return to work. However, there was ample evidence subsequent to the first report showing Mrs. Irvine continued to suffer from the injury and was unable to work. When an insurer receives an initial report showing the claimant is able to work, but later receives reports showing disability, the insurer may not blindly rely upon the earlier report and solely on that basis avoid penalties for arbitrary nonpayment of benefits which are due. Carter, supra; Walker v. Gaines P. Wilson & Son, Inc., 340 So.2d 985 (La.1976). Therefore, we affirm the court's assessment of penalties and attorney's fees.
Plaintiffs have answered this appeal, seeking an increase in the amount of attorney's fees. We grant an increase in the amount of attorney's fees (which the trial court set at $2,500) to $4,250. Such a fee reasonably compensates the attorney for his work, which we have reviewed and find to be substantial.
In conclusion, we amend the judgment of the trial court by increasing the amount of attorney's fees to $4,250. In all other respects the judgment is affirmed. Costs are to be paid by appellant-defendant Sentry Insurance Company.
AMENDED AND AS AMENDED, AFFIRMED.
NOTES
[1] This type of fracture occurs when a ligament pulls away from the attached bone and actually takes a fragment of bone with it.
[2] § 658. "All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees."
[3] Dr. Sinclair, apparently on January 7, 1980, addressed a note to the employer in which he stated: "So, therefore, she is considered disabled until released to return to full activity." The defendant does not deny receiving this note, only taking the position there is no evidence it was ever received by it or by the employer.